Filed 2/1/21  P. v. Dorton CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRED DORTON,<br><br>Defendant and Appellant. | B289699<br><br>(Los Angeles County<br>Super. Ct. No. BA435221) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David V. Herriford, Judge.  Affirmed.

Cannon & Harris; and Donna L. Harris for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Following a 10-day jury trial, Fred Dorton was convicted of attempted voluntary manslaughter and two counts of assault with a semiautomatic firearm and sentenced to 16 years in state prison. The prosecution arose from an incident that took place on the front porch of a property located at 4006 West 59th Place in the View Heights area of South Los Angeles. An entity called NBG Properties (NBG) claimed ownership of this home based on an auction purchase at a foreclosure sale two months earlier. Fred Dorton, the preexisting owner, claimed that the trustee's sale was invalid, and that NBG had no rights to the home. When NBG sent a crew to change the locks on the property on January 14, 2015, Dorton confronted the men with a loaded Glock .45 caliber semiautomatic handgun and ordered them to leave. In the ensuing altercation, one of the men was shot and seriously injured.

On appeal, Dorton asserts various grounds for reversal of his conviction. Finding no merit in any of them, we affirm.

## FACTS AND PROCEEDINGS BELOW

### A. Prosecution Evidence

#### 1. *NBG Purchases Dorton's Home*

NBG was a real estate firm that bought distressed properties and "rehabbed" them. Jason Balfany was a managing member of the business and was in charge of acquisition and resale of the properties. On November 14, 2014, at a trustee sale and auction, NBG purchased Dorton's house located on West 59th Place in Los Angeles. NBG received a trustee's deed about a week after the auction and recorded the deed on November 25, 2014.

Following the auction, Balfany engaged Freddie Brown, an NBG partner, to assist in contacting any occupants of the property. Brown went to the property either on the day of the auction, or the day after, and left a handwritten note on the door addressed "to whom it may concern." The note stated NBG had purchased the

2

property and asked the previous owner to contact him at the telephone number provided on the note. Dorton subsequently telephoned Brown, thanked him for the note, but said "the sale is going to be rescinded."

Over the next two months, NBG sought to determine whether the property was occupied or vacant. During each visit, NBG employees or agents knocked on the door, but received no response. NBG's attorney attempted several times to serve eviction papers on Dorton but without success. Balfany believed the property was vacant.

2. *January 13, 2015: NBG Posts 24-hour Notice of Entry and Receives Threatening Phone Call from Dorton*

On January 13, 2015, Balfany asked Brown to leave a notice on the property. Brown went to the house around 12:30 p.m. and taped on the outer security door a 24-hour "Notice of Entry." The notice stated an intent to enter the property to replace the locks and provide any current occupant with a copy of the new keys.

A security video from the same day showed Dorton parking in the driveway at 4:46 p.m., pulling documents off the door, and using his keys to open the door.[1] At approximately 5:00 p.m., Balfany received a phone call from Dorton.[2] Dorton asked Balfany, "[d]id

---

[1] As part of the investigation, police confiscated a DVR found inside the 59th Place property and downloaded videos from that DVR. At trial, video footage showing NBG representatives posting notices, as well as the events surrounding the shooting, was presented during the testimony of witnesses as they detailed events. That testimony included confirmation of certain time stamps on the video footage.

[2] Balfany was able to see the incoming phone number. He subsequently passed on the telephone number to NBG's eviction attorney, Ronald Richards, who contacted Dorton.

you leave this notice at my house?"  Balfany answered "yes" and told Dorton that NBG owned the property; Dorton responded, "No, you don't."  Balfany told Dorton that because they had not met anyone at the property, they were going to change the locks.  Balfany told Dorton that he was welcome to come get a key if someone did in fact live there.  Dorton seemed "very agitated" during the call, told them not to come to his property, and at one point said, "I'm giving you [a] deadly warning not to come."  When Balfany asked if the statement was a threat, Dorton replied, "take that as you will."

Balfany notified NBG's eviction attorney, Ronald Richards, about the telephone call with Dorton via an email sent later that evening.

3.  *January 14, 2015:  Events Preceding the Shooting*

On January 14, 2015, at 9:01 a.m., Dorton sent a facsimile transmission to NBG, directed to Brown, titled "void trustee upon sale" and asserting that NBG neither owns the property nor holds the status of a landlord with any rights to enter the property.

Balfany directed Brown and a crew of men to the house on 59th Place to change the locks.  Brown first went alone to post a notice and secured a handwritten notice to the screen door with tape, together with NBG's deed to the property and Brown's contact information.  At 12:52 p.m., Brown returned to the house with Hector Tobar, Daryl Brackens, and two other workers to change the locks.  James Mendoza joined them from a different job site.  However, on arrival at the home, a staff member from Brown's office informed him "the tenant had contacted" NBG.  Brown was told to wait on changing the locks until the tenant arrived.  Brown and his crew waited for the tenant.

At 12:55 p.m., Dorton called 911 to report a burglary at his home.  Dorton stated that he was not at home, but was watching

the events remotely via a security camera.[3]  Dorton said there were multiple males at his house.  When asked by the operator whether Dorton could see any type of instrument they might have to pry open the door, he responded that, "[i]t looks like they have some tools.  I can't tell what they are though."  When the operator asked, "No one is supposed to be at your house at this time?"  Dorton responded, "No, no one at all."

Los Angeles Police Department (LAPD) Officer Andre Dixon and his partner arrived at the house after hearing a radio report of a possible burglary.  Officer Dixon spoke to a neighbor, who was outside.  Officer Dixon saw some paperwork on the front door, and then walked around the house to ensure it was secure.  He also spoke to someone over the telephone.  Other officers arrived on the scene.[4]  Officer Dixon and his partner left the location.[5]

At 1:17 p.m., NBG attorney Richards called Dorton to follow up on his phone conversation with Balfany, to address Dorton's prior threat of deadly force.[6]  Richards told Dorton he could not use deadly force simply because "some locks are being changed and keys are being provided."  Dorton disagreed.  Richards told Dorton he would be provided with a set of keys.  Richards' goal was to ascertain whether Dorton had in fact threatened deadly force and to

---

[3] The audio recording of the 911 call was played for the jury.

[4] Officer Dixon testified that a burglary call, in light of the potential serious nature, will typically bring in immediate response from any available police vehicle in the immediate area.

[5] Although video footage of Officer Dixon's visit to the house was played for the jury during his testimony, no testimony regarding the time of his arrival or departure was elicited.

[6] Richards testified to the specific time of the call after his recollection was refreshed with his telephone bill.

assuage Dorton by letting him know they had purchased the property as a foreclosure and were simply seeking to secure it.

At 1:55 p.m., Officers Jorge Martinez and his partner arrived at the home in response to a call from a woman about a civil dispute. Officer Martinez spoke on the telephone with the woman who had contacted police. Officer Martinez gave the woman's telephone number to Brown and told Brown to contact her so they could possibly resolve the issue. Brown showed Officer Martinez a purchase deed. Brown stated they were planning to change the locks and give keys to the tenant. Officer Martinez advised Brown not to change any of the locks at the property and to go through the court process. Officer Martinez left at 2:17 p.m.

4. *January 14, 2015: The Shooting*

Shortly after the police left, Brown spoke with Balfany on the phone. Balfany stated it was okay for the men to start changing the locks, and Brown directed them to do so. Brown planned to continue waiting for the tenant after they completed the lock change. At about 2:30 p.m., Mendoza, Tobar, and Brackens started to change the locks.

Tobar used a pry bar and a hammer to break the lock on the outer metal security door. Tobar and Mendoza were attempting to remove the front door knob to exchange it with a different door knob. Brackens went across the street to his truck to change the battery on one of the drills.

Brown saw Dorton come running from the corner of 59th Place. Dorton pointed his gun at the men on the porch and said, "Motherfuckers, this is my house," and "get the fuck off my porch." Brown ran off the property, across the street. Tobar, standing on the porch, saw Dorton sweep his left hand over the gun and "rack" it. Tobar put his hands up and then ran off to the side of the property.

Mendoza, who had been standing behind Tobar, "smacked the gun" out of Dorton's hand, and it fell into a small puddle.  Mendoza attempted to grab the gun, but Dorton pushed him and managed to get hold of the gun again.  During the struggle, Mendoza dropped the drill in his hand.  Mendoza grabbed a hammer, swung it downwards at Dorton in self-defense, but missed.  Mendoza saw Dorton aiming the gun at him and reacted by using his left hand to grab Dorton's hand that was holding the gun.  Mendoza tried to take the gun away from Dorton again to avoid getting shot.  The two men got into a "wrestling match" for the weapon.  Mendoza tried to push the gun away from his side, but Dorton kept pulling it back in.  As Dorton pulled his arm back inward, he shot Mendoza.  Mendoza swung his hammer at Dorton, but missed again.  Mendoza ran towards Tobar and collapsed.  Tobar called 911.

After the shooting, Dorton appeared to pick up something from the ground and put it in his pocket.  Dorton then went to the front lawn, looked around, and ran away.  Video footage showed Dorton running from the property at 2:36 p.m.  Tobar was already on the phone with police at this point.

Brackens testified that while he was across the street, in his truck, he saw Dorton walk toward the porch and then saw Dorton wrestling with Mendoza.  Brackens heard a popping noise.  Brackens grabbed a .38 revolver from his tool box, and ran down the street.  Brackens returned a minute later and saw one of his co-workers collapse near the jet skis by the house.  Brackens put his gun in his pocket and went to help his co-worker.

Officer Martinez and his partner responded back to the house.  He saw Mendoza lying on the ground.  Mendoza was taken to the hospital, where it was determined he had been shot once in the abdomen.

5.    *After Calling 911, Dorton is Detained and Interviewed by Police*

At 2:36 p.m., Dorton called 911 and reported that he had been struck on the head and the lip by "a metal tool or something." Dorton said his mouth was bleeding. [7]  Dorton said that people had been breaking into his house.  When the operator noted they were responding to a shooting at the same address, Dorton responded, "It's the same incident."  When the operator asked, "So, nobody got shot?"  Dorton responded, "I think somebody got shot, yes."  Dorton stated he was three blocks away from the house.  Dorton stated the police had been out there twice that day after he told them men were trying to break into his house.  Dorton stated, "I called and the tenant called."

LAPD Officer Joseph Franco and his partner located Dorton two blocks from the residence.  Dorton said he had a gun in his right pocket.  The officers found a .45 caliber Glock and a magazine with eight rounds.  Officer Franco noticed there was an expended casing inside the barrel.  He examined Dorton, who had a lip injury and complained of an injury to the top of his head.  An EMT treated Dorton, who was given a bandage and an ice pack for his lip. Dorton declined to be transported to the hospital.

LAPD Detective Brad Golden interviewed Dorton later that day.[8]  During the interview, Dorton told Detective Golden that he lived at a different address on West 58th Street.  Dorton stated, "[T]hose guys were breaking into my house."  He explained he had been calling the police since about 1:00 p.m. that day, and they had come out on three or four occasions.  Dorton received updates on the men's actions because he had remote cameras on the property.  He

---

[7] The audio recording of the 911 call was played for the jury.

[8] An audio recording of the interview was played for the jury.

also spoke to his neighbor on the telephone.  Dorton stated that one of the men, who may have been "the Freddie Brown guy or not" was "literally trying to break in."  Dorton added, "I guess they had crowbars and things."  Dorton said there had been numerous attempts to break into his house in the past.

After Detective Golden observed that burglars typically would knock a few times and then break into the property, Dorton responded, "Okay, I know you guys have already talked to them so you already know they were attempting to change the locks.  So, that's what they were there for."  Dorton followed this statement by commenting that while the men may have told police they were there to change the locks, "they were coming there to break into the house.  Period."  When asked why the men would proceed to break into the house after the police had already spoken with them and obtained identification, Dorton responded, "Because I think they're just some fraudulent guys that were trying to not go properly through the court system . . . and they aren't calling any of the officers to come assist them with doing whatever it was they were doing."  When Detective Golden noted that Dorton had mentioned one of the men by name (Freddie Brown) and asked him how he knew that name, Dorton responded, "Because I've talked to Freddie before and you know I assumed that was probably who was there." When asked why he had talked to Freddie before, Dorton responded, "Because when the foreclosure sale originally occurred he contacted me and we had a conversation."

6.      *The Police Investigation*

Detective Golden confiscated a DVR at the house.  Videos were downloaded from the DVR.  No shell casings were recovered from the scene.

A firearms expert examined the .45 caliber Glock model 30 firearm taken from Dorton and it was deemed fully functional.  The

firearm had a trigger pull of six-and-a-quarter to six-and-a-half pounds. If someone had his hands over the slide of the firearm when it was fired, it could prevent the shell casing from being fully ejected.

**B.    Defense Evidence**

Karen Bennett-Green, Dorton's neighbor, had known Dorton, his wife, and their children for approximately 13 years. She further testified that Dorton and his family currently lived next door to her on West 59th Place. She did not know why Dorton would list an address on 58th Street as his residence.

Defense counsel recalled Officer Martinez, who confirmed that he told Brown not to change the locks, but to use the eviction process. Brown stated that he would do so. Brown also showed Officer Martinez a business card with Officer Dixon's name on it, which contained writing stating that it was a civil matter, not to change the locks, and to go through the eviction process.

**C.    Charges and Jury Verdict**

The case proceeded to trial on the following charges: attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1); assault with a semiautomatic firearm (*id*., § 245, subd. (b); counts 2 & 3); and discharge of a firearm with gross negligence (*id*., § 246.3, subd. (a); count 4). The indictment also charged the following enhancements: personal use and discharge of a semiautomatic handgun in the commission of count 1, causing great bodily injury (*id*., § 12022.53, subds. (b), (c) and (d)); personal use of a semiautomatic handgun in the commission of counts 2 and 3 (*id*., § 12022.5, subd. (a)); and personal infliction of great bodily injury in the commission of both counts 1 and 2 (*id*., § 12022.7, subd. (a)).

The jury returned a verdict of attempted voluntary manslaughter (Pen. Code, §§ 190.2, subd. (a), 664) as a lesser included offense to count 1, and assault with a semiautomatic

10

firearm as alleged in counts 2 and 3. The jury found true the gun use and great bodily injury enhancements. Dorton was found not guilty of attempted murder (count 1) and not guilty of negligent discharge of a firearm (count 4).

## D. Post-trial Proceedings

Following the February 3, 2017, jury verdicts, sentencing repeatedly was postponed as a result of a number of posttrial applications and motions filed by Dorton, including a motion for new trial. After a lengthy series of hearings, the trial court issued a 31-page memorandum of decision denying the motion for new trial. This appeal followed.

## DISCUSSION

## I

## Rulings on Evidence of Ownership and Possession of the Property

Dorton contends that the trial court erred and violated his constitutional rights by admitting the prosecution's evidence regarding NBG's claimed ownership of the property, and by unduly limiting the defense evidence addressing Dorton's right to possess the property. Respondent counters that the court's rulings neither precluded Dorton from presenting his theory of defense, nor amounted to an abuse of the trial court's discretion to reasonably limit evidence. We agree with the respondent.

## A. Background

### 1. *Trial Court's Admission of Evidence Regarding NBG's Ownership of the Property*

During pretrial discussions, defense counsel argued that any evidence about NBG's ownership of the property was "not relevant in this case" because "[t]he only issue is possession," which "gives rise to the right to possess and defend your property." The court

11

pointed out that the relevant jury instructions speak of the right to use force as an owner and possessor (see subsection 3, *post*), thus making ownership relevant, and asked defense counsel if he was "conceding that at that time [his] client did not have ownership of the premises." Counsel responded, "Absolutely not." When the court asked defense counsel on what basis he was asserting that Dorton was still the owner, when there was evidence of the NBG deed, counsel replied "[t]hat it was a fraud. It wasn't proper. But I don't intend to present anyone regarding ownership."

After further discussions on the issue, the court pointed out defense counsel was undermining his own position because if there was "nothing in the record whatsoever" showing any ownership dispute (and NBG had legal title), then there may be an argument that NBG agents were not trespassing on the property. The court further pointed out that NBG's ownership was relevant to explain the context in which the incident arose. The court added, however, that Dorton could testify that he believed he owned the property, which was relevant to explain how the disagreement began and why Dorton may have taken the position he took. When defense counsel stated that he would "bring in the original sales documents" the court responded, "I'm going to exclude anything beyond just [a] simple assertion . . . [pursuant to Evidence Code section] 352," but reiterated that Dorton could "testify based on what he believed," i.e., "if he testifies, he can say I don't think they own the property."[9]

---

[9] During trial, defense counsel told the court he intended to play the entirety of the police interview with Dorton "so my client doesn't have to testify." As noted in our summary of trial evidence, Dorton told the police the men on the property were "just some fraudulent guys that were trying to not go properly through the court system."

Later in the trial, while discussing the jury instructions, defense counsel again raised the issue of ownership to argue while NBG may be the owner and "have a right to possess," the men who entered the property had no such right. Counsel argued that because the men who came to change the locks were not named partners in NBG, their rights were clearly inferior to those of Dorton, who was identified by name in his grant deed. The court responded by pointing out that if the men were there at the behest of NBG, then it would be "no different than one of the three owners or Mr. Balfany" going to the property.

2. *Trial Court's Limitation on Evidence Regarding Unlawful Detainer Actions as Relevant to Dorton's Possession of Property*

Prior to trial, the prosecutor moved to exclude three unlawful detainer actions as both irrelevant and excludable under Evidence Code section 352. The prosecutor noted that the first unlawful detainer action filed on December 26, 2014, was denied for violation of a three-day notice to quit rule, while the two subsequent actions, filed May 18, 2015, and June 17, 2015, resulted in rulings in favor of NBG properties—including restitution for past rent and the right to remove Dorton from the residence. The prosecutor noted that Dorton had appealed the latter rulings, and was ordered to pay $150 per day in rent to NBG pending his appeal.

The prosecutor also sought to exclude any argument that Dorton "had [a] status within the house," stating he had lost any legal status following the sale and recordation of the trustee's deed. Citing a bankruptcy case, *Edwards v. Wells Fargo Bank, N.A.* (Bankr. 9th Cir. 2011) 454 B.R. 100, 106, the prosecutor noted that once a deed is recorded following a foreclosure sale in California, an original borrower, such as Dorton, no longer retains any interest in

13

the property and is essentially deemed a "squatter" within the home.

At a subsequent hearing on the issue, the court asked defense counsel if he was going to claim Dorton had the right to possession of the premises at the time of the incident. Counsel stated, "Right," because Dorton was never ordered out of his home pursuant to an unlawful detainer action. He maintained that such an action would be the sole remedy for NBG to take possession—regardless of whether the occupant is a tenant or "squatter," "because there are squatter['s] rights."

The court asked if counsel was intending to assert Dorton's right to possession in order to rely on CALCRIM Nos. 3475 and 3476, which give a person the right to use force in certain situations to eject trespassers or intruders. Defense counsel responded, "Partially." Counsel explained Dorton had the right to tell the men to leave the property, and when they refused, to point his weapon; thereafter, a squabble ensued during which his client was "attacked." The court pointed out that under CALCRIM Nos. 3475 and 3476, whether Dorton had any right to the property as either an owner or possessor was a factual issue for the jury to decide.

The court ascertained that only one unlawful detainer action had been filed before the shooting incident, and asked defense counsel if he was seeking to introduce any evidence with respect to any of the three unlawful detainer cases. Defense counsel stated that "[t]he only one we would ask for is the initial one where my client prevailed," and stated he wanted to introduce a certified copy or stipulation to show Dorton had "prevailed" in that action which in turn "allow[ed] him the legal right of possessor of the property."

The prosecutor pointed out that if the court let in the judgment there would have to be an explanation as to why it favored Dorton, noting it was dismissed simply due to a "technical

violation." The court stated the important thing "would be an action was filed and that there was no judgment entered against him for whatever reason." The court noted it sounded like the prosecution's evidence, at best, showed NBG owned the property, but that did not rule out the possibility that Dorton had a right to live there until he was lawfully evicted.

In its subsequent ruling, the court observed the bankruptcy case (*Edwards*) cited by the People spoke more to ownership and was not entirely clear on the issue of possessory interest. The court stated it appeared undisputed that Dorton was living in the house at the time of the incident.[10] The court thus determined the jury should receive evidence that while NBG had a deed of trust purportedly transferring ownership of the property, there had been no judgment or order (i.e., a writ of possession) requiring Dorton to leave the property. Accordingly, Dorton "had [a] sufficient possessory interest that might invoke [the CALCRIM Nos. 3475 and 3476] instructions" and allow him to argue "that he was taking actions to protect his possessory interest." The court, however, found the two detainer actions filed after the incident were not relevant, and further ruled it would limit the evidence under

---

[10] After hearing the evidence at trial, the court retreated from this "undisputed" observation, but noted there was at least enough evidence that Dorton occupied or lived at the home to warrant the giving of CALCRIM Nos. 3475 and 3476. (See *People v. Roldan* (2005) 35 Cal.4th 646, 715 [a trial court need only instruct on a defense theory when the evidence is substantial enough to merit consideration by the jury], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 321, fn. 22; accord, *People v. Barton* (1995) 12 Cal.4th 186, 195.) The court explained that if Dorton possessed the property, there remained the factual question of whether NBG was a trespasser and whether the force used by Dorton was reasonable under the circumstances.

15

Evidence Code section 352 to avoid relitigating the first unlawful detainer action. Consistent with this ruling, the court allowed defense counsel to elicit testimony at trial that an unlawful detainer action had been filed by NBG against Dorton, but that NBG had not been awarded a writ of possession. The court sustained the prosecutor's objections when defense counsel sought to elicit testimony that Dorton "won" the unlawful detainer action or that NBG "lost" the action.[11]

### 3. *Instructions on Defense of Property*

The court instructed the jury with CALCRIM No. 3475 (right of lawful occupant to eject trespasser), and CALCRIM No. 3476 (right of owner or possessor to use force to protect property from harm).[12]

---

[11] During pretrial discussions, defense counsel argued that the unlawful detainer action showed that his "client was awarded possessory interest in the property." The court responded, "That's not what happened," noting the case was "filed and dismissed."

[12] As given by the trial court, CALCRIM No. 3475 reads:

"The lawful occupant of a home may request that a trespasser leave the home. If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to the home or the occupants, the lawful occupant may use reasonable force to make the trespasser leave. [¶] *Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave. [¶] If the trespasser resists, the lawful occupant may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property. [¶] When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have

The court refused to give CALCRIM No. 3477 (presumption that resident was reasonably afraid of death or great bodily injury), finding insufficient evidence to support it. The court pointed out that this did not mean that Dorton was precluded from arguing the force he used was reasonable; it simply did not give him the benefit of the presumption contained within CALCRIM No. 3477.[13]

believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable. If the People have not met this burden, you must find the defendant not guilty of [c]ounts 1, 2, 3 and 4."

As given by the trial court, CALCRIM No. 3476 reads:

"The owner or possessor of real property may use reasonable force to protect that property from imminent harm. [¶] *Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm. [¶] When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of [counts] 1, 2, 3 and 4."

[13] CALCRIM No. 3477 reads: "The law presumes that the defendant reasonably feared imminent death or great bodily injury to (himself/herself)[, or to a member of (his/her) family or household,] if: [¶] 1. An intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 2. The defendant knew [or reasonably believed] that an intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 3. The

## B.  Relevant Legal Principles

" 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." ' [Citations.]" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)  We review the trial court's rulings on the admission and exclusion of evidence for abuse of discretion.  (*People v. Harrison* (2005) 35 Cal.4th 208, 230; *People v. Kipp* (2001) 26 Cal.4th 1100, 1123 [relevance objection]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 352 [Evid. Code, § 352 objection].)

"The trial court has broad discretion in determining the relevance of evidence [citations], but lacks [the] discretion to admit irrelevant evidence."  (*People v. Crittenden* (1994) 9 Cal.4th 83, 132.)  The trial court also has discretion to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

## C.  We Discern No Error in the Trial Court's Admission of Evidence Regarding NBG's Ownership

Dorton contends the trial court erred by allowing the prosecution to present evidence of NBG's ownership of the property, because NBG's purported ownership "was not relevant to resolution

_____

intruder was not a member of the defendant's household or family; [¶] and [¶] 4. The defendant used force intended to or likely to cause death or great bodily injury *to the intruder inside the home*.  [¶]  . . . [¶]  The People have the burden of overcoming this presumption. This means that the People must prove that the defendant did not have a reasonable fear of imminent death or injury to (himself/herself)[, or to a member of his or her family or household,] when (he/she) used force against the intruder. . . ."  (Italics added.)

18

of the issue of whether [Dorton] acted reasonably" during the confrontation. We disagree.

First, as noted by the trial court, one of the defense instructions, CALCRIM No. 3476, confers a right to an "*owner* or possessor" to use reasonable force under certain circumstances. (*Ibid*.) During pretrial discussions, Dorton stated he would not concede that NBG was the legal owner of the property, but instead claimed their deed was a "fraud."

During trial, defense counsel elicited testimony that Dorton told police during his interview that "fraudulent people" were "trying to get into his house." During closing argument, defense counsel stated, "how many people *believe* that they have a deed yet the family is still living there." (Italics added.) Counsel asserted that NBG "lost" their unlawful detainer action and that "while there are people who run housing scams particularly in minority neighborhoods," the prosecutor was telling the jury "[t]hat doesn't happen." Defense counsel told the jury there were instructions that specifically allow Dorton to protect his house and allow him to protect his home and that the "property [belongs to the people] who live there [and] continue to live there . . . live there today," i.e., Dorton. Defense counsel stated "where is your deed Mr. [prosecutor]," and then accused NBG attorney Richards of lying when he stated he had seen the NBG deed, and purported to know its validity, accusing him of being a swindler in other business dealings. Given this, Dorton's claim that the only real issue was "possession" is specious and spurious; evidence of NBG's ownership was clearly relevant.

Second, the trial court properly determined that NBG's ownership was relevant to explain the context in which the incident arose, and whether Dorton's response was reasonable under the circumstances. Under CALCRIM No. 3475 (right of lawful occupant

19

to eject trespasser), the jury was instructed that if a "trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to the home or the occupants, the lawful occupant may use reasonable force to make the trespasser leave." The instruction further states that in "deciding whether the defendant used reasonable force" the jury must "consider *all the circumstances as they were known to and appeared to the defendant,*" and "consider what a reasonable person *in a similar situation with similar knowledge* would have believed." (CALCRIM No. 3475, italics added.) Under CALCRIM No. 3476 (right of owner or possessor to use force to protect property from imminent harm), the jury was instructed that in "deciding whether the defendant used reasonable force, consider *all the circumstances as they were known to and appeared to the defendant* and consider what a reasonable person *in a similar situation with similar knowledge* would have believed." (*Ibid.*, italics added.)

During trial, Dorton's counsel aggressively cross-examined NBG witnesses with accusations that the NBG work crew came to commit a "home invasion" and clean out the house. In closing, counsel noted that one of the NBG crew members had a prior conviction for receiving stolen property and "the man's consistently a person who would steal your stuff," and "there are burglars and people like every witness the prosecution called who are more than happy to take what is yours." Counsel further argued that NBG "[k]ind [of] got a group of thugs together to come up in their cars" and "try to steal." He argued that "most thieves are cowardly they don't come in the morning when you're there," and "they don't come [at] night after work" but instead "they bring five people because . . . they hope that oh, please God [let us] fin[d] some little old lady at home let us find some old man at home let us fin[d] a kid who is home sick." Counsel stated "what they prey on this isn't news[.]

20

I'm not disclosing government secrets[.] You know that is what they do."

The prosecutor, in turn, elicited testimony that the NBG crew came only to change the locks and communicated that intention to Dorton through posted notices and conversations in which they offered to give him a copy of the keys. The prosecutor further elicited testimony that the NBG crew did not bring "dollies" or bags to collect items from the home, and presented still shots of the surveillance footage showing that the NBG crew brought a drill and a package with a doorknob and locks.[14] During closing argument, the prosecutor told the jury "the most important thing that your job will be is to figure out . . . what the defendant knew and what it means." The prosecutor argued that Dorton knew the home had been purchased at a foreclosure sale and that NBG was now the owner of the property. Dorton further knew that the NBG work crew was coming solely to change the locks—not to assault anyone or do harm. The prosecutor pointed out that Dorton was monitoring the house through a remote camera via his cell phone (as he told police when calling 911), and thus could see that the men were standing outside of the house and working on changing the locks; there was nothing sinister or mysterious in their actions. The

---

[14] In his closing argument, defense counsel mocked the testimony regarding the absence of dollies, stating, "And the prosecutor, government's lawyer, says we didn't bring dollies because anything that you take of mine is okay as long as you don't use a dolly[,] right[?] Can I come and take all your stuff[?] Can I get whatever I can carry[?]. *You know he would have.* No one here would let this happen. . . . Any of you had friends[,] people that had your house burglari[zed?] Every time you walk in after that you . . . worry who['s] been there. . . . What law says you get to evade [*sic*] my home[?] None." (Italics added.)

prosecutor argued that Dorton's act of running onto the property, pointing and racking his gun at the crew, was "a violent overreaction" and unreasonable under the circumstances.  In light of the evidence and position of the parties, the evidence regarding NBG's purchase and ownership of the property (and associated communications with Dorton) was critical to the jury's assessment of what, if any, immediate threat Dorton was facing on the day in question.

To the extent Dorton argues the trial court erred in preventing him from introducing his original sales documents "to counter NBG's claims of ownership," leading to the prosecutor exploiting this ruling by "remind[ing] the jury in closing argument that they had never been shown [Dorton's] deed to the property," the argument is misleading.

The fact that Dorton purchased and owned the property *prior* to the NBG foreclosure sale was wholly undisputed and acknowledged throughout trial.  Thus, to introduce his "original" sales documents would have only consumed unnecessary time and potentially misled the jury into believing there was some greater significance to these documents than merely establishing Dorton's prior ownership.  As such, the court properly excluded the evidence under Evidence Code section 352.  In closing argument, the prosecutor merely pointed out that Dorton had not produced a deed "that postdates November . . . November of 2014."

Accordingly, we find no error in the trial court's evidentiary rulings regarding ownership of the property.[15]  (*People v. Harrison,*

_____

[15] Dorton also argues that the ownership evidence "lead the jurors to believe that NBG was not a trespasser," and thus "[t]he trial court's error in admitting NBG's evidence of ownership resulted in the removal of [his] ability to assert a right to defend his

*supra*, 35 Cal.4th at p. 230; *People v. Kipp, supra*, 26 Cal.4th at p. 1123; *People v. Greenberger, supra,* 58 Cal.App.4th at p. 352.)

**D.  We Discern No Error in the Trial Court's Evidence Code Section 352 Limitations on Evidence Regarding Possession**

Dorton contends he was denied his right to present a defense "when the trial court refused to allow defense counsel to introduce evidence that [Dorton] was in legal possession of the property and NBG had no right to possession without first being awarded a writ of possession." Dorton identifies the evidence the trial court improperly excluded on the issue of *possession* as follows: (1) "a certified copy of the order from the first unlawful detainer action in December 2014 to show that [Dorton] had *prevailed,*" and (2) "a witness who was a real estate expert to explain the law related to unlawful detainer and self-help evictions." (Italics added.) As we explain below, the trial court properly limited the evidence regarding the unlawful detainer action under Evidence Code section 352, while it was defense counsel who decided against calling an expert witness on such matters.

---

home and eject trespassers." However, Dorton's argument does not undermine the relevance of the ownership evidence (or correctness of the court's evidentiary ruling), and instead echoes an argument counsel made in the trial court—i.e., that NBG had no legal right to change locks and should be deemed a trespasser as a matter of law. On appeal, Dorton does not brief any instructional error or infirmity with regard to the trial court's giving of CALCRIM No. 3475, but points out that "the jury received no evidence or instruction on the need for lawful owners to use the judicial process to obtain a writ of possession to retake possession of the property." The implication of the latter point is addressed in our discussion regarding the trial court's limitation on the admission of evidence regarding the unlawful detainer actions.

First, with regard to the unlawful detainer action, defense counsel did not dispute the prosecutor's representation that the first action was dismissed or denied due to inadequate service of a three-day notice to quit. Nor did counsel dispute that the subsequent unlawful detainer actions were resolved in favor of NBG. Given this, the trial court properly allowed Dorton to elicit testimony that NBG had not been awarded a writ of possession prior to the incident in question, and precluded Dorton from introducing the certified copy of the judgment to suggest he had been "awarded" a "possessory interest" in the property. The trial court also appropriately sustained the prosecutor's objections when defense counsel sought to elicit testimony that Dorton "won" (or NBG "lost") the first unlawful detainer action. These limitations helped ensure that the jury was not misled or confused into believing that the parties litigated the validity of NBG's title in the initial unlawful detainer action, or that a court actively bestowed upon Dorton a "legal" entitlement to possession. Indeed, while defense counsel asserted below that the unlawful detainer judgment demonstrated he was effectively "*awarded* possessory interest in the property" (italics added), and while Dorton seeks to suggest the same before this court, the case law he cites prohibiting the use of "self-help" to oust a tenant or occupant suggests otherwise. (See, e.g., *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1038 [explaining statutes prohibiting self-help evictions offer protections to holdover occupants "without regard to the parties' legal claims to title or possession," but also noting that " '[a] tenant holding over without permission *is technically a trespasser*' " (italics added)].)[16] In any event, Dorton's assertion of *evidentiary* error (the

_____

[16] The observation in *Spinks* regarding the legal status of a hold-over tenant appears equally applicable to an owner-occupier

24

only issue before us) based on the trial court's refusal to allow him to present the initial unlawful detainer judgment in a manner that would suggest he "prevailed" and was "awarded" a right of possession, lacks merit. (*People v. Greenberger, supra,* 58 Cal.App.4th at p. 352.)

Second, with regard to Dorton's assertion of error due to the absence of a defense expert on real estate issues, he fails to point to any ruling by the trial court precluding him from doing so, and the record indicates defense counsel decided against calling the expert.[17]

Prior to trial, defense counsel informed the court he planned on calling a real estate expert to explain the law with regard to self-help evictions and that "people can't come in and change your locks and lock you out because they say they own the house." The court told defense counsel to provide his witness information to the prosecution. At a subsequent hearing, the court asked defense counsel whether he had given his witness list to the prosecution. Counsel responded in the negative, stating he was waiting for the

---

who remains in the property after sale and recordation of new title. (See *Edwards v. Wells Fargo Bank, N.A.*, *supra*, 454 B.R. at p. 106 ["[I]n California, once a foreclosure sale concludes and the purchaser records the deed in accordance with applicable law, the original trustor or borrower no longer has an interest or right in the subject real property . . . [and] the debtor is essentially a 'squatter' "].)

[17] Indeed, in his opening brief, Dorton skirts the issue by simply stating that "[defense counsel] *wanted* to call a witness who was a real estate expert." (Italics added.) He then proceeds to set forth a summary of the trial court's rulings on other issues, including ownership, after which he concludes by arguing that the trial court's rulings collectively infringed on his right to present a defense.

court to rule on his motion to exclude evidence "about self help eviction or things of that nature," and did not "want to retain and pay somebody to come in and explain the law." The court asked counsel to nevertheless provide names to the prosecution so he could inquire about conflicts.

During trial, the prosecution called various NBG associates and workers as lay witnesses to testify to the events that led up to the incident, including that NBG went to the property to change the locks on the day of the shooting. In closing argument, the prosecutor cited the testimony regarding the lock change to argue that the NBG workers did not pose the type of threat that would warrant Dorton's armed response.

Defense counsel not only failed to call a real estate expert as a defense witness, he also sought to elicit legal opinions from the prosecutor's lay witnesses. Thus, in cross-examining NBG owner Balfany, defense counsel asked him whether he knew it was illegal for NBG to change locks without a writ of possession. The court sustained the prosecutor's objection on the ground that it called for a legal conclusion. After the prosecutor called NBG attorney Richards—to elicit his lay testimony regarding his telephone conversation with Dorton on the day of the incident (which spanned a total of eight pages)—defense counsel proceeded to cross-examine Richards by asking him a series of questions about unlawful detainer actions, ownership, and possessory rights. Defense counsel proclaimed Richards an "expert" and asked him about the only lawful way to gain "possession" of a home. Richards responded that if the home is not vacant and an occupant refuses to leave, then one must initiate an unlawful detainer action. Richards acknowledged NBG had not obtained a court judgment to allow possession, but added no such order is necessary to simply change locks to secure property. At another point defense counsel asked Richards about

his assertion that NBG is the owner of the property. Richards stated he had seen the deed, it was recorded, and thus he had no doubt NBG was the owner.[18]

Given that Dorton himself elicited the "expert" testimony that he complains of in his opening brief, and has failed to identify any ruling by the trial court precluding him from calling his own expert "on self-help evictions," Dorton's evidentiary challenges on these bases must fail.

## II
## Instructions on Accident or Mistake

In light of the evidence that Dorton and Mendoza struggled for control of the firearm before it discharged, Dorton contends the trial court erred in failing to instruct the jury on the defense of accident. To the extent the trial court had no duty to sua sponte instruct on the issue, Dorton alleges trial counsel was ineffective for failing to request the instruction. We find no merit in either contention.

Penal Code section 26 provides that "[a]ll persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five—Persons who committed the act or made

---

[18] After counsel sought to elicit testimony regarding individual members of the NBG work crew and the incident at the property, the prosecutor objected and the trial court summoned the parties for a sidebar discussion. At sidebar, the court noted Richards was not present at the scene and further noted that Richards had not, so far, testified as an expert—with the possible exception of some testimony on unlawful detainer actions. After the court told defense counsel he would sustain objections if counsel sought to elicit Richard's legal opinion on the use of force at the property (which counsel stated he wanted to do in the form of a hypothetical), defense counsel wrapped up his cross-examination.

the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." The general defense appears in CALCRIM No. 3404, which explains that a defendant is not guilty of a charged crime if he or she "acted without the intent required for that crime, but acted instead accidentally." (CALCRIM No. 3404; see also CALCRIM No. 510 [excusable accident in context of homicide].) However, the trial court has no sua sponte duty to instruct on accident because it amounts to "a pinpoint instruction" that specifically "relat[es] such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt." (*People v. Anderson* (2011) 51 Cal.4th 989, 997.) Dorton concedes he did not request such an instruction and his assertion of trial court error on this basis therefore must fail. (*Id.* at p. 996.)

Nor has Dorton established that trial counsel was ineffective for failing to request the instruction. As explained by our high court, "[i]t is particularly difficult to prevail on an appellate claim of ineffective assistance [of counsel]." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted.) Deficient performance cannot be established on direct appeal unless "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

During closing argument, the prosecutor argued that in light of Dorton's conduct leading up to the shooting, including his prior threats to use deadly force, the shooting of Mendoza was "not an accident" but "attempted murder." Defense counsel countered by stating "accident is not really the issue here." Instead, defense

counsel argued that Dorton initially pointed the gun in defense of his property, and then was pulled into an "absolute fight for his life." Defense counsel stated the prosecutor had the burden of proving beyond a reasonable doubt that Dorton did not act "in lawful self-defense." In subsequently addressing the separate charge of shooting a firearm in a grossly negligent manner, defense counsel urged the jury not to convict Dorton of that charge simply because they might decide "let's get him for something." Counsel asked the jury, "what part [of the shooting] was grossly negligent"— "not giving the guy the gun?" He then accused the prosecutor of trying to "get" Dorton with another charge. Defense counsel argued that Dorton had the right to be fully acquitted and continue his life unmarred by "a group of thugs coming into [his] house."

The record shows that defense counsel was seeking a full acquittal for Dorton and was relying on self-defense to support that acquittal. It also appears that counsel was concerned that if the jury's attention was focused on whether the firing of the weapon was because Dorton "acted" to pull the trigger by accident or mistake, as required by an accident instruction,[19] they might be

---

[19] CALCRIM No. 510 provides as follows:

"The defendant is not guilty of (murder/ [or] manslaughter) if (he/she) killed someone as a result of accident or misfortune. Such a killing is excused, and therefore not unlawful, if:

"1. The defendant was doing a lawful act in a lawful way;

"2. The defendant was *acting with usual and ordinary caution*;

"AND

"3. The defendant was acting without any unlawful intent.

"*A person acts with usual and ordinary caution if he or she acts in a way that a reasonably careful person would act in the same or similar situation. . . .*" (CALCRIM No. 510, italics added; *People*

tempted to convict him of the reckless shooting charge by determining that he created the dangerous situation that allowed the gun to discharge—and thus was somehow still responsible for the ensuing result.[20]  (Cf. *People v. Villanueva, supra,* 169 Cal.App.4th at p. 54, fn. 12 [stating that if a defendant brandished a weapon in a criminally negligent manner, "the accidental (attempted) homicide excuse would not apply"].) By instead characterizing Dorton's initial act of pointing his weapon as an attempt to eject trespassers from his property—and the subsequent struggle with Mendoza as one in which Dorton purely *reacted* out of self-defense—counsel apparently sought to avoid such an assessment and/or jury compromise.  This approach dovetailed with his argument for acquittal on the charge of negligent discharge of a firearm on the ground the evidence was in dispute as to whether it was Mendoza or Dorton who caused the gun to fire, which required the jury to acquit on this charge.[21]

---

*v. Villanueva* (2008) 169 Cal.App.4th 41, 54 [stating that if a defendant relies on an accident defense to an attempted murder charge, the jury should be instructed with CALCRIM No. 510].)

[20] Indeed, during closing argument, the prosecutor argued that Dorton did not act reasonably in response to the incident and that bringing a gun onto the property was reckless and dangerous.

[21] To that end, in discussing how the weapon might have discharged, defense counsel pointed out that the prosecution's ballistics expert had explained that if someone is pointing a gun and another person grabs and pulls on it, it will cause the gun to fire even though the holder did not himself pull the trigger. Counsel then told the jury that if there are two possible sets of circumstances, both reasonable, and one points to guilt and the other innocence they must "accept the version that points to innocence."  Even if counsel's description of the trigger release

In any event, Dorton did not take the stand and testify the shooting was an accident, nor did he make any statements to police to that effect. In addition, he did not even mention the shooting during his 911 call, but instead stated he had been struck by a metal object. As such, there was no testimony (or statement) by Dorton regarding an accidental discharge of the weapon. In contrast, Mendoza testified that during the struggle, he tried to push the gun away from his side, but Dorton kept pulling it back in. As Dorton pulled his arm back inward, he shot Mendoza.

In light of this record, we cannot conclude that defense counsel's failure to seek an instruction on accident or mistake—and instead rely on self-defense—was either ill-considered or strategically untenable. (See generally *People v. Lewis* (1990) 50 Cal.3d 262, 288-290.) Whatever other approach might have been available, we are not in a position on this record to fault the one chosen. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington* (1984) 466 U.S. 668, 689-690 [104 S.Ct. 2052, 80 L.Ed.2d 674].) Accordingly, we must deny relief on Dorton's ineffective assistance of counsel claim.

---

technically could have been consistent with a theory of accident or misfortune, we cannot, on this record, fault counsel's strategic decision to divert the jury's attention away from any assessment of culpability regarding the trigger release itself, and instead maintain its focus on the self-defense nature of the struggle as a whole.

## III
## Trial Court's Purported Ex Parte Communication
## With Jurors

Dorton contends the trial court's ex parte communication with jurors deprived him of his constitutional right to be personally present and represented by counsel at all critical stages of the proceedings. As explained below, no basis for reversal appears on this record.

### A. Background Facts

On February 1, 2017, the jury retired to deliberate after hearing closing arguments and was dismissed for the day at 4:30 p.m. After the jurors exited the courtroom, the court noted to counsel that it was aware that the alternate juror "has some issues with going past her time." The court added it was "not going to say anything unless she does, but if she has a problem I think we should consider perhaps letting her go to work and if we need her[,] calling her in. I don't think she works too far away." Both sides expressly stated that this would be "fine" with them. The court concluded the matter by stating, "Let's see how it goes tomorrow and maybe I'll have the bailiff talk to her."

The jury resumed deliberations the next day at 9:40 a.m. and submitted a jury question at 2:12 p.m., asking the court to provide a definition or example of the phrases "a definite and unambiguous intent" and "circumstances outside the plan" within the meaning of CALCRIM No. 600, the attempted murder instruction. By stipulation of the parties,[22] the court provided a response, and the jurors recessed for the day at 4:15 p.m.

---

[22] The record reflects that cocounsel Jaaye Person-Lynn was present telephonically for the question and stipulated to the given response.

The jurors resumed deliberations the following morning, February 3rd, at 10:00 a.m. At approximately 11:15 a.m., co-defense counsel Michael Fletcher told the court he wanted to address two issues. First, he stated he "was told that there is a juror who has communicated that he or she—particularly, she—cannot stay any longer passed [*sic*] today." Counsel stated that "[i]f that is true, [he] would have liked to have been notified about it" and that he wanted "to know if that was, in fact, conveyed and if any response was given." Second, counsel stated he was not present the day before when the court responded to the jury question, and that while the court's response likely benefitted Dorton, he believed it was in error. The court noted that cocounsel Person-Lynn had stipulated to the given response and that it believed the response was correct and appropriate.

As to counsel's first inquiry, the court responded as follows: "I *was advised by the court staff* that there are two jurors who expressed issues with the time. One, being the alternate juror, who, to my understanding, was late arriving and may not have even arrived late, but she's not deliberating. The other is the juror who is seated in seat No. 7, *who, I was advised*, indicated that she cannot be here beyond today. I will note that I told them that the case would be concluded today.[23] *I have made no inquiries of*

<hr>

23 Prior to trial, while discussing potential hardships, the court told prospective jurors it estimated the trial would take about two to three weeks, and conclude no later than February 3rd. In so estimating, the trial court explained that "[a] trial is fluid. It's dynamic. It changes. When I tell you how long it will be, it's an estimate. It might be a little longer. Might be a little shorter." The court stated that part of its estimate included "an estimate on [the jury's] deliberations" and explained, "Once you get the case as a juror you go back in the room and you deliberate to come up with a

*them. I do not want to pressure them.* I don't want to interfere with what they're doing, so what do you want me to do?" (Italics added.)

Fletcher responded that he wanted the court to bring out the juror and "inquire whether she has shared that information with her fellow jurors" because he was concerned they may "feel a time pressure or time constraint," which is not a valid consideration.

The court responded by saying, "Well, as to the alternate, we discussed allowing her to go to work. . . . If we did have to call her in, I don't know how much delay that would cause." As to the sitting juror, the court stated, "My first reaction would be it's only 11:15. I share your concern. I don't want them to rush, but perhaps we should wait and see how things develop." The court added, "Why don't we—I mean, obviously, *she came to us with that information*—so, it's important to her. Why don't we just wait. When it gets to the afternoon, I think I'd be inclined to inquire at some point. But it's 11:00 o'clock in the morning, so I think it's a little premature." (Italics added.) "As to the alternate," the court added, "if the two of you are fine with her going to work, the problem is if something happens and I have to excuse someone and she's not going to be here. *I think if she's here today, we should keep her here today.*" (Italics added.) Fletcher stated that he thought they'd already agreed to allow her to go to work. The court responded, "[t]he two of you agreed she could go back. She was here yesterday and she didn't request, *so I didn't want to bring it up with her until she brought it up with me. She did apparently contact the staff today and indicated she would have difficulty serving past today.*" (Italics added.) Fletcher responded, "She said that. And I

---

decision. There's no limit on that. I don't know how long that's going to take. Sometimes jurors deliberate for a couple of hours. Sometimes it's days. Sometimes longer. So I don't know."

don't—I mean, we promised her she would be released.  I mean, I'm not encouraging that.  I thought she'd gone back to work to buy us some time."  The court responded, "Given how much time we've all invested in this, if they express concerns, I'm certainly going to see if there's anything we can do—if they don't finish today—to have them come back and finish the task that they're supposed to be doing.  But, once again, if it looks like they can't do that without me pressuring them, we will take that up at the appropriate time.  Right now it's premature."  Prior to recessing, the court concluded, "I would suggest maybe perhaps mid-afternoon, if they're still deliberating, I'll inquire of the jurors."

At 2:20 p.m., the jurors submitted a second question, asking, "If we move to the lesser count of attempted manslaughter[,] are [CALCRIM Nos.] 603 and 604, to be ruled together as part of the same count?"  The court met with counsel to discuss the jury's query, noting the jury appeared to be asking about CALCRIM Nos. 603 and 604 which address different theories under which a defendant could be convicted of attempted voluntary manslaughter.  The court noted it was inclined to instruct the jury that each of these instructions states two distinct theories of liability.  Defense counsel Fletcher stated the problem with that instruction is that it could lead to conviction, and the jury should therefore be directed to also consider the defenses, such as self-defense.  The court stated it had an obligation to answer the question "in the most informative and neutral way" possible.

When Fletcher stated that sometimes there are questions "the court simply can't answer," the court asked if he would like the court to bring out the jury and make further inquiries of the foreperson regarding their query.  Fletcher responded, "No.  I don't want to put pressure on the jury," and stated the simplest way to respond is to tell the jury that these are two viable theories of

conviction and then also instruct them that there are "viable theories of acquittal or defense." The court responded that the jury had not inquired about defenses, but to avoid answering the question "in a vacuum" the court would add that the jury should "consider all of the instructions in arriving at [their] verdict."

Fletcher objected, stating this would constitute instructional error and moved for mistrial. The court denied the motion, and stated it would write out the answer and deliver it to the jury as stated. Fletcher raised no issue regarding the jury's time pressure, nor did he renew his request to inquire of the jury as to any potential time pressure. The court delivered a written response to the jury's question as follows: "[CALCRIM i]nstructions [Nos.] 603 and 604 state two separate and distinct theories of liability for attempted voluntary manslaughter. Consider all of the instructions in arriving at your verdict."

At 4:15 p.m., the jury announced it had reached its verdicts. The jury acquitted Dorton of attempted murder, but unanimously found him guilty of attempted voluntary manslaughter of Mendoza. The clerk read the verdicts in open court. At the request of defense counsel, the trial court individually polled the jury and each individual juror confirmed that this was their verdict.

## B. Relevant Legal Principles

"A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465.) Generally, " '[a] trial court should not entertain, let alone initiate, communications with individual jurors except in open court, with prior notification to counsel.' " (*People v. Clark* (2011) 52 Cal.4th 856, 987). However, " '[n]ot every communication between the judge and jury constitutes

a critical stage of the trial.' [Citation.]" (*Ibid.*)[24] "Specifically, a trial court properly may engage in ex parte communications for ' "scheduling, administrative purposes, or emergencies that do not deal with substantive matters . . . ." ' [Citations.]" (*Ibid.*) As our high court has observed, " ' "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The . . . conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice." ' [Citation.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 330, italics omitted.)

## C. The Record Does Not Demonstrate that Ex Parte Communications Between Jurors and the Trial Court Occurred

First, in light of the record summarized above, it is not clear that the trial court engaged in any ex parte communications with either the alternate or seated juror, and the record suggests

---

[24] The rule regarding court communications with deliberating jurors is codified in Penal Code section 1138, which states in pertinent part: "After the jury have retired for deliberation, if there be any disagreement between them *as to the testimony, or if they desire to be informed on any point of law arising in the case,* they must require the officer to conduct them into court" and "the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (Italics added; see also *People v. Bradford* (2007) 154 Cal.App.4th 1390, 1412 [quoting the statute and noting Pen. Code, § 1138 codifies the rule prohibiting ex parte communications between the trial judge and the deliberating jury].)

otherwise.  Defense counsel stated he heard that a juror had communicated scheduling concerns, and counsel was trying to ascertain if this was true—and "*if* any response was given."  (Italics added.)  The trial judge acknowledged two jurors had contacted court staff but stated he himself had not made any inquiries of them.  The trial judge also indicated that he was not even aware if the alternate juror was in the courthouse that day.  The only statement that led defense counsel to believe the judge had personally spoken with the jurors was when the judge made the following observation:  "I will note that I told them that the case would be concluded by today."  Given that the record reflects that the trial judge told prospective jurors the trial would likely take two to three weeks "and it will be concluded no later than *February 3rd*" (italics added), and that the day of the conversation with counsel took place on February 3rd—it is likely that this isolated comment was in reference to the court's previous trial estimate.

To the extent defense counsel was concerned about a purported ex parte communication, counsel did not pursue the issue after expressing his initial concerns.  In his reply brief, Dorton argues "[t]he fact that the court denied even a request to question the juror shows that any further objection or request for mistrial would have been futile."  This misstates the record.  The court expressly told counsel, "[w]hy don't we just wait," and that "[w]hen it gets to the afternoon, I think I'd be inclined to inquire at some point," demonstrating the court was receptive to the idea of speaking to the jury regarding the issue of time constraints.  Later that afternoon, at 2:20 p.m., the jury sent a question to the court, which would have provided an opportunity for defense counsel to reassert his request.  Counsel again raised no issue regarding any purported comments the trial court may have made to jurors that morning.  The fact that defense counsel did not further pursue the

issue after the initial conversation—despite a clear opportunity to do so—raises further doubt that any ex parte communication even took place.  In any event, we will not presume error on an ambiguous record.  (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 [stating it is the defendant's "burden to provide a record on appeal which affirmatively shows that there was an error below, and any uncertainty in the record must be resolved against the defendant"]; see also *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown' "].)

## IV

## Defense Pinpoint Instructions

Dorton contends the trial court erred, and violated his constitutional rights, when it refused to instruct the jury with two special instructions regarding the circumstances under which a person may lawfully carry a loaded firearm.  We disagree.  The instructions proffered by Dorton were argumentative and potentially confusing to the jury, while any relevant legal principles underpinning those instructions were adequately and correctly conveyed through the given CALCRIM instructions.

## A.    Relevant Facts and Proceedings

At the conclusion of the presentation of trial evidence, defense counsel submitted five pinpoint instructions, including the following two instructions at issue in this appeal:

Proposed Special Jury Instruction No. 1 stated:  "A person may carry any loaded firearm, under circumstances where it would otherwise be lawful, by a person who reasonably believes that any

person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property.  [¶]  Immediate means the brief interval before and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before the arrival of its assistance."

Proposed Special Jury Instruction No. 2 stated:  "The use of the word 'carry' means going about armed, as well as the further proposition of transporting the weapon with intent to use it as such."

The court denied Dorton's request for these special instructions because they either did not "accurately state the law" or were "not germane to this case."

Following Dorton's motion for new trial, in which he argued the trial court erred by denying his pinpoint instructions, the court determined the instructions were properly rejected, finding them "argumentative, unsupported, or duplicative."

## B.     Relevant Legal Principles

A trial court must instruct the jury on general principles of law necessary for the jury's understanding of the case.  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.)  "In addition, 'a defendant has a right to an instruction that pinpoints the theory of the defense . . . .' "  (*People v. Roldan, supra*, 35 Cal.4th at p. 715.)  The court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing."  (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

## C.     The Trial Court Properly Refused Dorton's Proposed Pinpoint Instructions

First, Special Instruction No. 1 contained language that was improperly argumentative.  An instruction that "invite[s] the jury to

draw inferences favorable to [the defendant] from selected items of evidence" is properly refused as argumentative. (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.) In describing the "immediate" danger that might justify the carrying of a loaded firearm, Special Instruction No. 1 sought to define "immediate" as "*the brief interval before and after the local law enforcement agency* . . . has been notified of *the danger* and *before the arrival of its assistance.*" (Italics added.) Given that Officer Martinez and his partner left the scene at 2:17 p.m., minutes prior to the shooting, and returned a short time later after the shooting, Dorton's instruction sought to extract specific facts from the events in this case and then use these facts to suggest that the presence of NBG at the scene constituted an "immediate danger" that he, Dorton, was left to handle on his own. This language in the proposed instruction is clearly argumentative and, as Dorton acknowledges in his reply brief, not sanctioned by any legal authority. (*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [disapproving " 'of the common practice [of] select[ing] certain material facts, or those which are deemed to be material, and endeavoring to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law"].)

Second, Special Instruction No. 2 was potentially confusing to the jury. Instruction No. 2 defined "carry" as going about "armed, as well as the further proposition of transporting the weapon *with intent to use it as such.*" (Italics added.) The latter phrase is ambiguous and undefined.[25] (*People v. Hendricks* (1988) 44 Cal.3d

---

[25] Dorton cites a 1923 case, *In re Bergen* (1923) 61 Cal.App. 226, 228, as the source of the definition. *Bergen*, which involved a charge of carrying a concealed weapon, in turn, cited *State v. Larkin*

635, 643 [noting that in refusing a proposed instruction the court "correctly followed the long settled rule that an instruction that may confuse the jury should not be given"].)[26]

Third, Dorton's special instructions focused the jury on a fact that was not at issue. That is, Dorton's special instructions told the jury that a person may "carry" any loaded firearm if he or she "reasonably believes that any person or the property of any person is in immediate, grave danger." However, Dorton did not merely "carry" (i.e., transport) his weapon onto the property; he drew it, pointed it, and "racked" it. The question of whether Dorton's actions were reasonable under the circumstances was best answered under the CALCRIM self-defense/defense of property instructions that allowed both sides to argue *all* of the relevant circumstances. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 499 [no error where the "content of the [proffered] instruction was adequately conveyed to the jury" through the given instructions]; *People v. Ledesma* (2006) 39 Cal.4th 641, 720 [no

---

(1887) 24 Mo.App. 410, wherein the court explained that the phrase "for the purpose of using it as such" implicated the factual question of whether the defendant "carried the article as a weapon . . . for the purpose of using it as such if occasion should require"—as opposed to "a mere article of merchandise." (*Id.* at p. 412.) In *Larkin*, the defendant claimed he was merely carrying the weapon home after he purchased it. (*Id.* at p. 411.)

[26] Although the trial court did not expressly reject the instruction on grounds it might confuse the jury, we may affirm the trial court's ruling on any correct basis. (Cf. *People v. Hopson* (2017) 3 Cal.5th 424, 459 [stating a trial court ruling will be upheld if it is correct under any theory of law applicable to the case]; *People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11 [" 'we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm' "].)

error in refusing proposed pinpoint instructions where the same underlying principle "was fully explained to the jury in other instructions"].)

CALCRIM Nos. 3475 and 3476 provided a basis for defense counsel to point out that Dorton was "not charged with anything that would suggest this gun is anything more than lawful," and to argue that Dorton did not have to keep his gun in his pocket, but had the right to use it to protect himself and his home.  This included pointing the gun he lawfully possessed, and asking the men to leave his property.  (*People v. Hughes* (2002) 27 Cal.4th 287, 363 [finding no reversible error where defense counsel was able to "emphasize[ ] and 'pinpoint[ ]' " the defense theory under the given instructions]; *People v. Wright*, *supra*, 45 Cal.3d at p. 1134 [the defendant's proposed pinpoint instructions properly were rejected where the same point was "plainly implied" by a statement in the given instructions].)  Conversely, the prosecutor argued that Dorton's act of running onto the property and pointing and racking his gun at the crew, was "a violent overreaction" and unreasonable under the circumstances—which was consistent with the assault charges filed against Dorton.

Given that defense counsel was able to, and did argue, that the manner in which Dorton used his weapon was lawful and justified under the evolving circumstances of the confrontation, no error flowed from the court's decision to decline Dorton's instructional request.  (*People v. Mora and Rangel*, *supra*, 5 Cal.5th at p. 499; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 720.)

## V

## Prosecutorial Error During Closing Argument

Dorton contends the prosecutor misstated the law during closing argument, thereby allowing Dorton to be convicted on an illegal or invalid legal theory.

Dorton first points to a series of closing statements in which the prosecutor "emphasized" the evidence regarding NBG's ownership of the property.[27]  Defense counsel, however, failed to object to any of these statements during trial.  " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 281.)  " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.)  Dorton does not argue any of the latter exceptions apply and has therefore forfeited any assertion of error regarding these statements.  (See *id.* at p. 943.)  Moreover, and as discussed earlier, evidence of NBG's ownership was relevant on several fronts—including the question of whether Dorton's response was reasonable under the circumstances.  (See Discussion I, subsection C, *ante.*)

Dorton next points to a statement that did garner an objection from defense counsel—and a curative admonition by the trial court.  Toward the end of his initial closing statement, in discussing defense of property, the prosecutor put up a slide and argued that,

---

[27] Dorton points to the following series of statements regarding NBG's ownership, made by the prosecutor at various points during closing arguments:  (1) "They own that house."  "NBG owns that property."  "NBG [P]roperties owns that house."  (2)  The prosecutor told the jury that a deed is important and "expresse[d] ownership of property."  (3)  "The $452,000, that was paid by the new owners[,] NBG Properties.  A deed is a deed.  100 percent.  No doubt.  It's their house.  It's easily provable."

"You can't use force against . . . an owner of the property or its agent." Defense counsel objected.

At sidebar, the court stated it was not clear whether an owner could *never* be deemed a trespasser within the meaning of CALCRIM No. 3475. The court noted the instruction does not define trespasser and it appeared to be a question for the jury to decide under the common definition of that term. As such, the court reiterated that both sides could argue their position. However, the court found the prosecutor's slide might not accurately state the law and told the parties it would instruct the jury to disregard it. The court subsequently instructed the jury to "disregard what was in the last slide." To the extent Dorton now believes the trial court's admonition was insufficient, he has forfeited the issue because trial counsel did not assert a further objection. (*People v. Hoyt*, *supra*, 8 Cal.5th at p. 944 [failure to assert a further objection after the trial court's clarification to the jury, forfeited appellate review of the claim of prosecutorial error]; see also generally *People v. Potts* (2019) 6 Cal.5th 1012, 1035 [declining to find an exception to the ordinary forfeiture rules for assertions of prosecutorial error directed at alleged misstatements of law].)[28]

_____

[28] To the extent that Dorton has premised his appellate argument on the contents of the slide (as opposed to the prosecutor's own statements), we further note that Dorton failed to make a record of the slide, or any of its contents, in the trial court. Therefore, the issue has not been preserved for appellate review. (*People v. Brown* (2003) 31 Cal.4th 518, 553 [explaining that "[t]o preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, *make known the basis of his objection*, and ask the trial court to admonish the jury"], italics added; cf. *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 102 ["Appellate review is generally limited to matters contained in the

In light of this record, Dorton has failed to present any cognizable claims of prosecutorial error for appellate review. (See *People v. Hoyt*, *supra*, 8 Cal.5th at pp. 943-944.)

## VI

## Cumulative Error

Dorton contends the cumulative effect of the alleged errors described above denied him due process and compels reversal. In light of the foregoing discussion, there are not multiple trial errors to accumulate. (*People v. Capers* (2019) 7 Cal.5th 989, 1017-1018.)

## VII

## Dorton's New Trial Motion

Dorton contends the trial court erred in denying his motion for new trial, arguing that his trial attorneys, Michael Fletcher and Jaaye Person-Lynn, were ineffective because they failed to interview or call certain potential defense witnesses. They also failed to present his medical records to show the extent of the injuries he received during the incident. Dorton acknowledges that he himself "did all the pretrial investigation" and that "Fletcher received everything" and "knew the names of the potential defense witnesses and the anticipated testimony of each." Dorton further notes that "Fletcher received all of the reports, the videos and the still photographs." Similarly, cocounsel Person-Lynn "knew the names of the witnesses and the testimony each was expected to give at trial. . . . He also had knowledge of the jail medical records and the surveillance videos."

---

record. Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs"]; Cal. Rules of Court, rules 8.204(a)(2)(C), 8.360(a).)

Notwithstanding this knowledge, Dorton asserts defense counsel provided ineffective assistance of counsel because they themselves failed to speak to these prospective witnesses and/or failed to present their testimony at trial, and failed to introduce the medical records. As discussed below, we discern no basis upon which to overturn the trial court's decision.

## A. Background Facts

### 1. *Pre-trial Proceedings*

Prior to his arraignment, Dorton, a licensed attorney with criminal defense experience, was granted the right to represent himself. Nearly two years later, on January 12, 2017, Dorton told the court he was ready for trial, and refused to waive time. When asked how many defense witnesses he anticipated calling, Dorton responded, "Right now we don't know if we'll have any witnesses."

The next day, on January 13, 2017, private defense attorney Fletcher substituted in as trial counsel, with Person-Lynn as cocounsel. Fletcher announced he was ready for trial. The court pointed out the defense had indicated it may have as many as 10 witnesses. Fletcher, in response, stated the witnesses he intended to call would relate to the issue of self-help evictions, and that he might also call a real estate expert to explain the law in this area.[29] Fletcher subsequently explained to the court he would be relying on a combination defense, arguing that Dorton initially acted in

---

[29] As noted in our factual summary, Fletcher called a neighbor who testified that Dorton and his wife resided at the property and a police officer who testified he advised Brown not to change the locks and instead proceed through the court system. He did not call a real estate expert. (See Fact and Proceedings Below, subsection B [Defense Evidence], *ante*.)

47

defense of his property, and then was pulled into a self-defense scenario.

2. *Post-trial Proceedings, Including Motion for New Trial*

On February 6, 2017, following the jury verdicts, Dorton reinstituted his pro per status. Sentencing was repeatedly postponed as a result of numerous post-trial motions filed by Dorton over the next few months, none of which are before us on appeal. On October 11, 2017, Dorton filed a 101-page motion for new trial, raising several constitutional issues, including inadequate representation by trial counsel.

Dorton's new trial motion came on for hearing on October 26, 2017. Dorton indicated he had subpoenaed seven or eight witnesses to testify in support of his motion. The trial court heard testimony from some witnesses on this day, and heard further testimony on subsequent hearing dates. On February 2, 2018, the trial court issued a 31-page memorandum of decision denying the motion for new trial.

a. **Potential witnesses identified in new trial motion[30]**

(i) *Fred Dorton*

Dorton executed a declaration stating that he would have testified he lived at the house with his wife and children for over 14

---

[30] Our summary focuses on the witnesses identified and discussed in Dorton's opening brief. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) To the extent Dorton references ballistics expert Patricia Fant in his reply brief, Dorton provided neither a declaration from Fant, nor presented her as a witness at the hearing on the motion for new trial. Therefore, we do not address the failure to call this witness. (See *People v. Watts* (2018) 22 Cal.App.5th 102, 118 [a new trial motion's assertion of inadequate

years.  On January 14, 2015, "several men armed with loaded guns" came to his house, broke the front door locks, forcibly opened the door, and entered the house.  Dorton called 911 to report a burglary.  When the men returned, Dorton's wife called 911 to report a burglary.  Dorton then "attempted to arrest the men while they were actively committing felonies" at his house.  During this attempted arrest, Mendoza attacked Dorton, striking Dorton twice on the head with a hammer.  Dorton did not shoot Mendoza; the gun accidentally discharged.

Dorton did not testify at the hearing on his new trial motion.

(ii)     *Kimberly Smith-Dorton*

Dorton's wife, Kimberly Smith-Dorton, executed a declaration stating she and Dorton purchased the home where the shooting occurred and that she never agreed to allow anyone to change any locks.  She also observed Dorton's head injuries.  She was never contacted by Dorton's attorneys to testify at trial.  She stated she was not a tenant at the property, and denied ever stating she was a tenant.  She further declared that Officer Martinez was not being truthful in testifying that she told him to give Brown her telephone number, or that she told the officer she would meet Brown at the house.

Smith-Dorton did not testify at the hearing on Dorton's motion for new trial.

(iii)     *Real Estate Expert Jack Fierstadt*

Jack Fierstadt submitted a declaration stating he was an attorney with expertise in unlawful entry, possession and foreclosure issues.  Fierstadt attempted to contact Fletcher during the week of January 10, 2017, to discuss his potential trial

---

representation due to the failure to call a witness must be supported by an affidavit or live testimony of the witness].)

testimony, but never received a return telephone call. Fierstadt stated he previously had been "made aware" by Dorton of the issues involved in the case, including "issues concerning the legality of changing the door locks and entering Mr. Dorton's home without a court order or valid writ of possession." Fierstadt declared that his testimony "would have refuted [his] understanding of the prosecution's theory that a deed or 24-hour notice allows locks to be changed without the consent of the person in possession."

Fierstadt did not testify at the hearing on Dorton's new trial motion.

(iv) *Kim Goodman*

Kim Goodman testified at the new trial hearing as follows: Goodman's husband, Agee, owned a .38 caliber revolver. Brackens, one of the NBG crew, was Agee's handyman. Agee owned a property on 108th Street, and kept a handgun there. At one point, Brackens went to the property to help the family move. Thereafter, Goodman noticed the gun was missing. Goodman reported the missing gun to the Corona Police Department in 2013.

(v) *Thomas Guzman-Sanchez*

Thomas Guzman-Sanchez testified at the new trial hearing as follows: Guzman-Sanchez was an audio and video forensics expert and was appointed prior to trial to assist the defense. He was expected to testify at Dorton's trial but never was contacted by either Fletcher or cocounsel Lynn-Person. Guzman-Sanchez analyzed videos of the incident and used them to create two DVDs. He created the first DVD for trial, and the second for the new trial motion. To create the DVDs, he viewed the original home surveillance videos at slower speeds, broke down the individual frames captured on the videos, and used the images to prepare a video to be used at trial to impeach the prosecution's witnesses.

50

Dorton played the DVD created by Guzman-Sanchez as he questioned Guzman-Sanchez about its contents. Guzman-Sanchez described his analysis of the events depicted on the DVD as follows. The video depicted a person with a "very defined bulge" in the back of his shirt. Guzman-Sanchez testified there was a clearer image that, according to Guzman-Sanchez, depicted Brown with a concealed weapon. At some point, Brown gave a head nod, and Tobar and Mendoza grabbed tools. Tobar used "a very large hammer with some type of a prying device" and was "banging it into the doorknob," while Mendoza stood behind him. According to Guzman-Sanchez, Brackens, Tobar, and Mendoza appeared to be breaking into the house.

Brackens walked to a truck across the street and accessed a tool box before walking toward Tobar. At some point, Brackens appeared to have a gun in his hand. Guzman-Sanchez pointed to the video showing that Brown went to a Mini-cooper, and Brackens ran to his truck.

When Dorton approached, Tobar ran. Dorton had a gun in his hand. Dorton never pointed the gun at Tobar. The handgun was knocked out of Dorton's hand. Mendoza grabbed a hammer. The video depicted someone with a gun in his hand running and placing it into a backpack. Dorton appeared to pick up a phone or an object inconsistent with a bullet casing.

Guzman-Sanchez also attempted to recreate what occurred during the four seconds when Mendoza and Dorton were out of camera range. Guzman-Sanchez based his recreation on the testimony at the grand jury hearing, as well as Mendoza's police interview. Based on the positioning of the feet that could be seen in the video, Guzman-Sanchez was able to determine the "rough positioning of [the] bodies" and concluded that Mendoza's body was on top of Dorton's body during this time period.

Guzman-Sanchez also received two files from an iPhone. A neighbor using an iPhone camera captured the audio of a second gunshot occurring after Mendoza was shot. The sound could have emanated from Brackens' or Mendoza's location. The gunshot occurred at a time when the video showed Brackens was off to the side with his arm extended.

Guzman-Sanchez went with ballistics expert Patricia Fant to the Riverside sheriff's firing range. Together they tried to recreate the sound of the second gunshot captured on the audio recording. Fant shot two .38 caliber firearms, a .45 caliber firearm, and a .357 caliber firearm, while Guzman-Sanchez recorded the sound from 185 feet away. The gunshot fired by Fant with the .38 caliber weapon came closest to the sound heard on the iPhone recording. Based on this analysis, Guzman-Sanchez opined that the gunshot sound could have come from Brackens' location, inferring that Brackens fired the shot from his .38 revolver.

### b. Testimony of trial attorneys

#### (i) *Matthew Fletcher*

Fletcher testified at the hearing on the motion for new trial. He confirmed he was Dorton's lead attorney during trial. He had been an attorney for 20 years and had handled "hundreds and hundreds" of cases. He became familiar with Dorton's case approximately a week or two prior to trial. When he announced he was ready for trial, he was prepared to try the case. Fletcher received the surveillance video footage and other information related to the case from Dorton. He had all the information he needed to do his job. Fletcher did not believe the case was complicated, he had a strategic plan, and he believed he executed the plan effectively.

Fletcher was aware that Fierstadt, Smith-Dorton, Guzman-Sanchez, and others, were possible defense witnesses. However,

Fletcher did not interview or call them to testify. The prosecutor had listed Smith-Dorton as a witness. Fletcher, however, believed the spousal privilege applied to her testimony.

As for Guzman-Sanchez, Fletcher believed the "video forensic stuff" was "made up science." However, Fletcher did recall speaking with Guzman-Sanchez about the Dorton case at some point. Fletcher acknowledged he subsequently called Guzman-Sanchez as a witness in another case. The latter case involved a nighttime shooting and Fletcher believed that Guzman-Sanchez's expertise would be helpful in the context of that case. Because Dorton's case occurred during the day, the use of Guzman-Sanchez "would have never have crossed [his] mind."

Fletcher acknowledged he did not prepare Dorton to testify and did not call Dorton as a witness. Fletcher was present when the trial court advised Dorton of his right to testify. Fletcher could not recall what Dorton said after being advised of his rights, but did not recall Dorton indicating he wanted to testify. Moreover, because Dorton was an attorney, Fletcher knew that Dorton was aware of his right to testify.

Fletcher also testified that it was Person-Lynn's job to interview and call witnesses for the defense. Fletcher therefore did not make any strategic decisions regarding who was called or not called as a witness. Fletcher's responsibility was to handle witnesses called by the prosecution. Fletcher knew Dorton's medical records were available but did not submit them at trial because that was Person-Lynn's responsibility.

(ii)    *Jaaye Person-Lynn*

Person-Lynn also testified at the hearing on the motion for new trial. He was the second chair during Dorton's trial. He did not do any investigation prior to being retained. Dorton appeared to have control of the defense evidence prior to trial.

Person-Lynn was aware of Fierstadt, Guzman-Sanchez, and Smith-Dorton, among others, and was aware of what their potential testimony would entail. Neither Fletcher nor Person-Lynn interviewed those witnesses, nor called those witnesses to testify. Person-Lynn was surprised that certain witnesses were not called and was not aware of any tactical decision made regarding those witnesses.

Person-Lynn knew that Dorton wanted to testify and believed that Dorton would be called as a defense witness because that had been discussed. He was aware of what Dorton would say on the stand. However, Person-Lynn did not prepare Dorton to testify because he believed Fletcher would do so.

Person-Lynn had observed Fletcher with Dorton's medical records, which showed that Dorton had a head injury. Fletcher did not present those records at trial. Person-Lynn was not aware of a tactical decision to not submit those records.[31]

---

[31] In his opening brief, Dorton also identifies potential witness "Kimberly Shaw," but relies solely on Person-Lynn's testimony regarding Shaw's purported testimony. The record indicates that Dorton withdrew a declaration by Shaw. This, combined with Shaw's failure to testify at the hearing on the motion for new trial, leaves us with only inadmissible hearsay on the matter. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1109 [motion for new trial based on hearsay properly was denied as it did not constitute admissible evidence that probably would have resulted in a different verdict]; *People v. Watts*, *supra*, 22 Cal.App.5th at p. 118 [new trial motion's assertion of inadequate representation due to the failure to call a witness must be supported by an affidavit or live testimony of the witness].)

In any event, through his examination of Person-Lynn, Dorton elicited that Shaw would have testified she had lunch with Dorton on January 14, 2015, and was with Dorton when he received

### 3. *Trial Court Ruling*

The trial court denied Dorton's new trial motion, finding that Dorton neither established that trial counsels' performance was deficient, nor that he was prejudiced by any purported deficiency in trial counsels' performance. The specific findings and conclusions of the trial court are further discussed below.

## B.    Relevant Legal Principles

" ' " ' "We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.' " ' " ' [Citation.]" (*People v. Hoyt*, *supra*, 8 Cal.5th at p. 957; *People v. McCurdy*, *supra*, 59 Cal.4th at p. 1108.) " '[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. [Citation.]' [Citation.]" (*People v. Dyer* (1988) 45 Cal.3d 26, 52.)

"Although ineffective assistance of counsel is not among the grounds enumerated for ordering a new trial under Penal Code

---

the telephone call at 1:17 p.m. from NBG attorney Richards. Shaw did not hear Dorton tell Richards he would use deadly force while Dorton was in her presence. In denying Dorton's new trial motion, the trial court reasonably concluded that this purported testimony was not likely to have changed the outcome in the case. Shaw's testimony would not have implicated Balfany's testimony regarding Dorton's initial threat to Balfany. Nor would it necessarily have undermined Richards' testimony that when he told Dorton over the telephone that Dorton could not use deadly force, Dorton disagreed with him. Moreover, the threats were relevant to the premeditated attempted murder charged in count 1; the jury found Dorton not guilty of attempted murder.

section 1181, motions alleging ineffective assistance are permitted pursuant to 'the constitutional duty of trial courts to ensure that defendants be accorded due process of law.' " (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209, quoting *People v. Fosselman* (1983) 33 Cal.3d 572, 582.)  The defendant has the burden of showing both the ineffectiveness of counsel and the prejudice it caused.  (*People v. Dennis* (1986) 177 Cal.App.3d 863, 872.)

**C.    We Discern No Error in the Trial Court's Denial of Dorton's New Trial Motion**

At the outset of its discussion, the trial court pointed out that Dorton "was an experienced attorney who proceeded in propria persona and conducted all of the pretrial investigation," and then on both January 5, and January 12, 2017, "announced [he was] ready for trial and refused to waive time."  The following day, Fletcher became attorney of record and both sides announced ready for trial. The court found that during trial, Fletcher "rigorously and painstakingly cross-examined all of the prosecution's witnesses."

To the extent both Fletcher and Person-Lynn testified there was no discussion regarding whether to call the defense witnesses identified by Dorton, the trial court found the following:  "[T]he court does not find credible the testimony of either trial counsel that there was no discussion regarding the decision not to call the defense witnesses.  Person-Lynn testified that [Fletcher], [Dorton], and himself, conversed about the witnesses and their potential testimony.  [Dorton] has been actively involved in the defense of this case since the beginning, including during the 24 days that Fletcher and Person-Lynn represented him.  The court does not find it credible that the two defense attorneys and [Dorton], himself an attorney, did not discuss defense strategy amongst themselves, including whether or not to call defense witnesses."

To the extent the trial court's credibility assessment was based on the court's own observations of Fletcher and Person-Lynn during their hearing testimony, it is entitled to great deference. (See generally *People v. Barnwell* (2007) 41 Cal.4th 1038, 1053 ["we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal"]; *People v. Avila* (2006) 38 Cal.4th 491, 529 [noting that the tone of voice, apparent level of confidence, and demeanor of a witness divulges valuable information that does not appear on the record].) To the extent the trial court's finding was based on the court's observations of the conduct of counsel and Dorton throughout the pretrial and trial proceedings, it is equally entitled to deference. (See *People v. Fosselman, supra*, 33 Cal.3d at p. 582 ["It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them"].)

In addition, the trial record supports, rather than contradicts, the court's findings and conclusions. On the day Dorton presented Fletcher as his attorney, Dorton told the trial court he intended to act as "cocounsel" by consulting with Fletcher outside of the presence of the jury. Dorton points out that the trial court made it clear he must either represent himself or be represented by counsel—and thereafter reminded Dorton he must not speak in court. Nothing in the court's ruling prohibited Dorton from doing exactly as he stated he intended: to engage with counsel "not necessarily in front of the jury" but during "discussions outside of the presence of the jury that [he] may need to be [a] part of." Moreover, Dorton fully acknowledges in his opening brief, that both Fletcher and Person-Lynn (as confirmed in their respective testimony) "knew the names of the potential defense witnesses *and the anticipated testimony of each*." (Italics added.) Nevertheless,

Dorton argues that the failure of Fletcher and Person-Lynn to *personally* interview each witness necessarily establishes that both attorneys failed to "evaluat[e] the potential impact of [witness] testimony on [Dorton's] defense." Further, they failed to "consider[ ] all the potential evidence amassed by [Dorton]." In so arguing, however, Dorton falls prey to the fallacy of false equivalence.

The Sixth Amendment requires that trial counsel either conduct "reasonable investigations *or . . .* make *a reasonable decision that makes particular investigations unnecessary*." (*Strickland v. Washington, supra*, 466 U.S. at p. 691, italics added.) Here, as the trial court pointed out, Dorton "was an experienced attorney" who "conducted all of the pretrial investigation," and thereafter announced he was ready for trial. This, in conjunction with Dorton's admission that both of his attorneys were fully briefed on the proposed testimony of each potential defense witness, undermined Dorton's assertion that counsel acted unreasonably by failing to personally interview these witnesses. As explained by the United States Supreme Court in *Strickland*, "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. . . . For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." (*Id.* at p. 691.)

The *Strickland* court's observations are even more apt in a case, such as this, where the defendant is an experienced criminal defense attorney who himself conducted the pretrial investigation and provided that information to the attorneys retained to represent him.

In his opening brief, Dorton criticizes the trial court for citing *People v. Bloom* (1989) 48 Cal.3d 1194, 1226-1227, in its decision. He points out that in *Bloom,* the defendant complained of ineffectiveness of counsel during a time when the defendant was representing himself—i.e., during the penalty phase of his trial. Dorton asserts that he, "unlike Bloom, did not represent himself at trial." This is true. However, the omissions Dorton identifies to claim ineffective assistance of counsel relate to actions that Dorton himself undertook before trial—investigating and interviewing potential defense witnesses.[32] As such, it was wholly appropriate for the court to cite *Bloom*, as it did, for the following proposition: That "a self-represented defendant may not claim ineffective assistance [of counsel] on account of counsel's omission to perform an act within the scope of duties the defendant voluntarily undertook to perform personally at trial." (*Ibid*.) This, combined with the trial court's finding that counsel did not testify credibly in claiming there was no discussion regarding these witnesses, well supports the trial court's ultimate determination that, under the circumstances of the case, trial counsel's strategy to not interview the defense witnesses was not unreasonable.

We further agree with the trial court's finding that "there would be many tactical reasons for not calling each of the witnesses" identified by Dorton, and that Dorton "fail[ed] to show how the potential testimony, if presented, would have likely changed the outcome of the case."

---

[32] The fact that Dorton, after announcing ready on the day prior to trial, expressly told the court that he did not know if he would call any witnesses to the stand, also is consistent with the trial court's conclusions.

First, with regard to trial counsel's failure to call Dorton to the stand, the trial court noted that Dorton "elected not to testify during the hearing on the [new trial m]otion, instead choosing to submit only his self-serving declaration . . . that was not subject to cross-examination."  Dorton's failure to testify at the hearing on the new trial motion undercuts his ability to prove his claim that his trial attorneys were incompetent.  (See *People v. Dennis*, *supra*, 177 Cal.App.3d at p. 873 ["Since the burden is upon the defendant to prove his claim of ineffectiveness of counsel, the choice whether to present evidence or to remain silent is also his.  But his decision must be made in light of the fact that silence will not support a motion for new trial"].)

Moreover, the trial court expressly advised Dorton of his right to testify during trial.[33]  In denying the motion for new trial, the court noted that Fletcher advised the court during trial that he intended to play the entirety of Dorton's police interview so that Dorton would not have to take the stand.  The recording was played for the jury during trial.  Under these circumstances, the trial court reasonably found that Dorton could not "credibly claim that he did not have the opportunity to testify."

Second, with regard to trial counsel's failure to call real estate expert Fierstadt, the trial court found no resulting prejudice, noting that "[t]his was not a lockout," and that "at no time during the trial proceedings or during the lengthy post-trial proceedings has

---

[33] Prior to the presentation of the defense case, the trial court advised Dorton he had an "absolute right to testify" and an "absolute right not to testify."  The court stated, "It's my understanding you have chosen not to testify after consultation with your attorney.  Is that what your decision is?"  Dorton replied, "I choose not to answer, your Honor."  The court concluded, "So, I've given you the advisement that you know that you have that right."

[Dorton] demonstrated he was the lawful owner of the home at the time of the incident." Nevertheless, the trial court allowed Dorton to elicit testimony that the NBG crew had not obtained a writ of possession, and argue that he was attempting to eject the NBG crew as trespassers. As we previously explained, Fletcher initially indicated he would call a real estate expert, but subsequently changed his mind—attempting instead to elicit favorable opinions from prosecution witnesses. (See Discussion I, subsection D, *ante*.)

Dorton himself did not present Fierstadt as a witness at his new trial motion hearing. Instead he relied on a vague, conclusory, and untested, statement in Fierstadt's declaration that Fierstadt would have refuted "the prosecution's theory that a deed or 24[-] hour notice allows locks to be changed without the consent of the person in possession." Dorton contends Fierstadt would have disproved the prosecution's theory that NBG was a lawful owner of the property with the right to enter the property, which would have bolstered the defense argument that the NBG crew members were trespassing. Fierstadt's cursory statement, however, is inadequate to disprove the prosecution's theory, and therefore does not support Dorton's burden to show Fletcher was incompetent in failing to call Fierstadt to testify. Moreover, as noted by the trial court, the most relevant inquiry at trial was whether Dorton's actions were reasonable under the circumstances.

Third, with regard to video analyst Guzman-Sanchez, the trial court found that the videos he created "do not clearly show that any members of the NBG crew were carrying firearms on the [p]roperty before Mendoza was shot"; "that the videos do not have significant impeachment value beyond what was presented to the jury"; "and that the analysis of the videos is speculative and conclusory." The trial court cited as an example Guzman-Sanchez's testimony "that one of the witnesses was carrying a gun, based

61

merely on an image of the witness with a slight bulge or wrinkle in his shirt." As to the remaining "evidence" cited by Guzman-Sanchez, the trial court pointed out that any elicited testimony regarding Brackens and his firearm "occurred after the shooting of Mendoza." We discern no error in the court's determination of these matters, and conclude that trial counsel did not render deficient performance in deciding against calling Guzman-Sanchez as an expert witness at trial. (*Strickland v. Washington, supra,* 466 U.S. at p. 689 ["It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . . [T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy' "].)

Fourth, with regard to the failure of counsel to call Dorton's wife to the stand, the trial court noted that her proposed testimony would have had "marginal relevance." Further, at best, her statement that she never spoke to the NBG crew amounted to "collateral impeachment," given the "clear evidence" that Dorton himself had been notified that the NBG crew would be changing the door locks at the property. We further note that Smith-Dorton was originally on the prosecution's witness list. At the pretrial hearing, Fletcher informed the court that Smith-Dorton was the "alleged tenant" at the property, but pointed out that she "cannot be forced to testify against [Dorton]" and "[s]o the People won't be calling her." This statement comports with Fletcher's testimony at the new trial hearing wherein he indicated he believed the spousal privilege applied to her testimony. In contrast, Smith-Dorton's posttrial declaration states that she was not a tenant and she never told anyone she was a tenant. Her statement contradicts Fletcher's representations to the court. Smith-Dorton's failure to testify at the new trial hearing undermines the utility of her declaration, which is

untested by cross-examination.  (*People v. Dennis, supra,* 177 Cal.App.3d at p. 873 ["With regard to a motion for a new trial, it has been said ' "there can be no such thing as a legal trial, unless both parties are allowed a reasonable opportunity to prepare to vindicate their rights" ' "].)

Fifth, the testimony by Goodman, which implied that Brackens might have stolen his .38 firearm from her home, thereby potentially impeaching his testimony that he received the firearm from his brother-in law, also amounted to collateral impeachment, at best, and would not have altered the outcome of the case.

Finally, with regard to the failure of counsel to submit Dorton's jailhouse medical records, the trial court observed that the "alleged medical record" proffered at the hearing on the new trial motion was "vastly redacted and [did] not reflect that [Dorton] suffered a head injury on the date of the incident."  The court pointed out that "[t]he jury saw pictures of [Dorton's] injuries after [his] arrest and heard testimony from the emergency medical technician who treated [Dorton].  The pictures and testimony indicated that [Dorton] suffered a small cut to his upper lip and that no injuries were visible on the top of [Dorton's] head." Accordingly, the trial court concluded that the alleged medical record "even if admissible at trial, would not have reasonably impacted the jury's determination of [Dorton's] guilt."

On appeal, Dorton does not cite to any part of the record containing the alleged medical records.  (See Cal. Rules of Court, rules 8.204(a)(2)(C), 8.360(a).)  Instead, he cites to testimony he elicited from Person-Lynn during his new trial hearing.[34]  In

---

[34] Trial counsel Fletcher testified that he knew Dorton's medical records were available, but did not submit them at trial because that would have been Person-Lynn's responsibility.

questioning Person-Lynn, Dorton asked him whether, during the course of the trial, Person-Lynn had "observe[d] attorney Matthew Fletcher with the certified medical records of Fred Dorton from the Los Angeles County Jail that established that Fred Dorton suffered a head injury." Person-Lynn responded, "Yes I did." Dorton followed up by asking Person-Lynn, "And that was from being hit in the head with a hammer on January 14th 2015, by James Mendoza?" Person-Lynn responded, "Yes, from my understanding." Person-Lynn agreed these records could have been offered to refute Mendoza's testimony that he did not make contact when he tried to strike Dorton with a hammer during the struggle. Person-Lynn also agreed that these records would have refuted the testimony of the paramedic who testified that Dorton originally declined any treatment at the scene.

Person-Lynn's responses to Dorton's leading questions are not a substitute for the presentation of admissible evidence of the contents of the medical records. His testimony, in light of the trial record, is insufficient to satisfy Dorton's dual burden of establishing that trial counsel was ineffective for failing to seek admission of his jailhouse medical records, and that this alleged ineffectiveness prejudiced him. (*People v. Dennis*, *supra*, 177 Cal.App.3d at p. 873.)

In sum, the record discloses no basis upon which to overturn the trial court's conclusion that none of Dorton's ineffective assistance of counsel claims constituted a basis for granting Dorton's new trial motion.[35]

---

[35] To the extent Dorton asks us to aggregate the prejudice flowing from the ineffective assistance claims identified in his new trial motion with any prejudice flowing from his ineffective assistance claim in Discussion II, there is nothing to aggregate. (See Discussion II, *ante*.)

## DISPOSITION

The judgment of the trial court is affirmed in all respects.
NOT TO BE PUBLISHED


FEDERMAN, J.*


We concur:



ROTHSCHILD, P. J.



BENDIX, J.


---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.